Argued May 2, reversed and remanded November 13, 1963,
petition for rehearing denied January 15, 1964

# FOXTON *v.* WOODMANSEE

386 P. 2d 659
388 P. 2d 275

*Hugh B. Collins,* Medford, argued the cause for appellant. On the brief were Collins, Redden & Mullen.

*Gerald H. Robinson,* Portland, argued the cause for respondent. On the brief were Peterson, Lent & Paulson and Lohman & Robinson.

Before McALLISTER, Chief Justice, and PERRY, O'CONNELL, DENECKE and LUSK, Justices.

LUSK, J.

This is an action for malpractice against an osteopathic physician and surgeon. The jury returned a verdict for the defendant which the court set aside. The defendant appeals.

The plaintiff, a woman 55 years of age, sustained a Colles' fracture of her right wrist as the result of a fall on an icy stepping stone in her back yard. She consulted the defendant, who sent her to the Portland Osteopathic Hospital where he reduced the fracture. The operation was performed on the evening of January 12, 1960, the day that plaintiff was injured. On July 20, 1961, plaintiff filed her complaint alleging

that the negligence of the defendant has caused her pain and suffering, displacement and abnormality of the right wristbones and deformity and stiffness of the hand and fingers, nerves and soft tissues.

The case was tried upon an amended complaint, in which the specifications of negligence are as follows:

"1. In attempting to reduce the fractures without sufficient prior experience, and without adequate knowledge of the necessary placement of the bones and a cast. (There was no evidence to support this charge.)

"2. In placing a cast upon plaintiff's arm with her hand * * * in the wrong position.

"3. In placing a cast upon plaintiff's arm which extended too far outward on the fingers thereof.

"4. In failing and neglecting to remove said cast and replace the same with a cast with plaintiff's hand in the proper position."

After the verdict for the defendant was returned the judge announced from the bench that he would set it aside on his own motion on the ground that there was undisputed evidence that defendant was negligent in "leaving the cast to the fingertips for too long a period or leaving the cast on to the fingertips". Subsequently the plaintiff filed a motion for a new trial and the court entered an order granting such motion on all the grounds therein specified and specifically ordering a new trial on its own motion on the grounds theretofore stated from the bench.

The sole question is whether there is adequate basis in the record for the order.

A brief statement of the evidence becomes necessary.

A Colles' fracture was defined by one of the expert witnesses as "an upward displacement of the distal

end of the radius bone, which is the upper arm bone next to the thumb." By upward he meant "bending up toward the back of the hand rather than the palm." The defendant had the arm X-rayed and from the film made an X-ray diagnosis of a comminuted impacted Colles' fracture of the plaintiff's right wrist. Reduction of the fracture was accomplished while the plaintiff was under a general anesthetic and the plaintiff's right arm was thereafter placed in a plaster of Paris cast in "mid-position" by which the radius is maintained straight with the hand tipped slightly to the ulna side, that is, toward the little finger. The cast extended about to the end of the little finger and exposed the tips of the other three fingers. Because of the "hypermobility" of the fracture, the defendant extended the cast "beyond the average to help maintain the position of the hand and to prevent as much as possible the retraction of the head of the radius, which is our problem." The defendant intended to cut the cast back at the end of three weeks to allow for freedom of the fingers.

On January 13, 1960, the date following the operation, the defendant ordered the plaintiff discharged from the hospital.

Doctor Woodmansee saw the plaintiff in his office a number of times thereafter. She was very much concerned about the outlook for the appearance of her wrist and the effect of the injury on her work. She was at the time she sustained her injury a billing clerk, whose duties included operating a computer. The defendant explained to her that only time would tell about these things, that the immobilization would have to be maintained for some time and that she was "really going to have to work at it to get the function in there". By working at it he meant carry-

ing out a program for exercising the hand and fingers. Ultimately the defendant concluded that he was not "getting through to her" and called in Doctor John E. Scanlon for consultation. Doctor Scanlon is an osteopathic physician and surgeon on the staff of the Portland Osteopathic Hospital.

Doctor Scanlon concluded from his examination of the X-rays that "this was a very difficult fracture," that it was "severely comminuted" and that it "would be very difficult to hold these fragments in their proper alignment." He felt that a remanipulation and recasting would bring about an improvement on the previous reduction and so recommended to the plaintiff.

She consented and on January 26, 1960, Doctor Scanlon, with the defendant assisting, "rendered a closed reduction under anesthesia" and casted the arm in what is called the Cotton-Loder position in which the fingers are bent downwards towards the palm. A medical witness testified that it is sometimes called the bell boy position, because "it is like a bell boy reaching for the tip in the back".

The plaintiff thereafter continued to be under the defendant's care. On March 4, 1960, the cast was removed by a technician at the hospital. The defendant was present. From then until April twenty-sixth, the defendant saw the plaintiff about twice a week for the purpose of instructing her in the exercises necessary to overcome the stiffness in her hands and fingers. The defendant testified that he "kept insisting that she wasn't doing enough, because she wasn't getting the result that should have been expected" and she said that she was exercising "but it hurt too much," and he told her in response that "she had to do it in spite of some hurt."

Doctor Edwin A. Mickel, an orthopedic surgeon called by the plaintiff, testified that there was a foreshortening of the radius of the plaintiff's right arm due to the failure to put the original cast in the proper position and that this was not done until two weeks later when it was too late to do anything about it. In Doctor Mickel's opinion the right position was the Cotton-Loder position. There was no dispute about the fact that the radius was foreshortened, but there is conflict in the evidence as to whether the method used by the defendant was a proper method and whether the foreshortening of the radius was due to the method used by the defendant or was something impossible to have been avoided, in view of the character of the fracture, no matter what method was employed. There is no conflict about the fact that the plaintiff suffered certain abnormalities and stiffness in the right hand and fingers and wrist, but whether these were the result of the alleged negligence of the defendant in casting the plaintiff's arm in a position which Dr. Mickel considered improper, was a jury question. We do not understand that the plaintiff contends otherwise.

The trial judge based his ruling that the defendant was guilty of negligence as a matter of law upon certain testimony given by Doctor Scanlon on direct examination. Doctor Scanlon was asked by the attorney for the defendant whether he had an opinion as to "whether or not the application of the Cotton-Loder cast achieved any result superior to that which would have been achieved had the original cast or the original cast position been left alone." An objection to the question was sustained. The witness was then asked substantially the same question, but limited

solely to shortening of the radius. The testimony continued:

"A  Yes, I have an opinion.

"Q  What is your opinion?
"A  The ultimate outcome would probably have been the same.

"Q  Do you have an opinion as to the reason for the disability from which the patient suffers at the present time?
"A  Yes, sir.

"Q  What is your opinion?
"A  The maintenance of the Cotton-Loder position for a longer period of time than usual.

"MR. PETERSON: Objected to, Your Honor.

"THE COURT: You just now testified the ultimate outcome would not have been any different.

"MR. COLLINS: We were limiting it to the radius, Your Honor, on that question.

"MR. PETERSON: Well, I will withdraw the objection."

The trial judge, in announcing his ruling that he would order a new trial on his own motion, referred to this testimony as an admission of malpractice on Doctor Scanlon's part. He continued:

"Thus, if he [Dr. Scanlon] committed a malpractice, the attending physician [Dr. Woodmansee] would be responsible. Based upon that reasoning, the Court should have directed the jury's attention and should have advised the jury that the defendant was negligent with regard to one point, that is, leaving the cast to the fingertips for too long a period or leaving the cast on to the fingertips and that the plaintiff would be entitled to that sum of money from the jury as to that point."

1, 2. We are unable to concur in this appraisal of the evidence in question. It may be assumed for present purposes that in the circumstances of this case Doctor Woodmansee would be liable for any negligence of Doctor Scanlon in the latter's care and treatment of the plaintiff. See *Ybarra v. Spangard,* 25 Cal 2d 486, 490-492, 154 P2d 687, 162 ALR 1258. In any case the defendant continued his care of the plaintiff after the Cotton-Loder cast was applied. But Doctor Scanlon as a witness on the trial of this case was not an agent of Doctor Woodmansee. Certainly his statements in court were not made *dum fervet opus.* No admission of his as a witness would bind the defendant. The court appears to have treated the testimony as a judicial admission of the defendant. The brief of the plaintiff so characterizes it. But a judicial admission is one made by a party or his attorney for the purpose of dispensing with proof of a fact in issue. *Garvin v. Western Cooperage Co.,* 94 Or 487, 499-500, 184 P 555; 20 Am Jur 469, Evidence § 557; Black's Law Dictionary (4th ed) 69. Doctor Scanlon was not a party to this litigation.

■ Furthermore, even though the statement had been made by Doctor Woodmansee himself, it would not have been an admission of negligence. The applicable rule has never been better put than in *Staloch v. Holm,* 100 Minn 276, 279, 111 NW 264, 9 LRA NS 712 (per Jaggard, J.):

"* * * Nor is it significant whether, as plaintiff's case tended to show and defendants' case to deny, the defendant subsequently made damaging admissions concerning the propriety of the operation, in view of his after-acquired knowledge. His negligence is to be determined by reference to pertinent facts then in existence, of which he knew or

should have known in the exercise of due care, when the operation was performed. It would be a work of supererogation to cite authorities for so obvious and necessary a principle, or for this specific application of a general rule. There is an apt and neglected analogy in the rule restricting proof of the presence or absence of probable cause for instituting an original judicial proceeding complained of in an action for malicious prosecution to known or knowable facts in existence at the time of the commencement of that original proceeding."

See, also, *Donahoo v. Lovas,* 105 Cal App 705, 710, 288 P 698; *Quickstad v. Tavenner,* 196 Minn 125, 264 NW 436; *Phillips v. Powell et al,* 210 Cal 39, 43, 290 P 441; 70 CJS 1005, Physicians and Surgeons § 62.

Either the defendant or Doctor Scanlon, in retrospect, might have come to realize and conceded that the cast should have been removed earlier than it was without admitting the charge of malpractice. The principle involved was embodied in the following portion of the court's instructions:

"* * * A doctor is not to be judged by afteracquired knowledge or by the results of his treatment. In other words, the applicable test is whether under all the facts and circumstances then confronting the attending doctor, the techniques of treatment he employed and the treatment which he administered to the patient were in accordance with what an ordinary, prudent, careful and skillful osteopath would have done at the time and under the conditions then existing, not what hindsight may reveal should have been done in the light of subsequently occurring conditions. This is the standard by which a doctor's conduct is to be measured and if the doctor uses such care and skill but forms an erroneous judgment as to the condition or appropriate treatment to be administered, he is not negligent."

■ There was no expert testimony in the case as to the length of time during which, according to the standards of the medical profession in the community (and so far as this case is concerned the standards for medical doctors and osteopaths are the same) the arm of a person suffering from a Colles' fracture may properly be kept in a cast, regardless of the position in which the arm is placed. There is evidence that when the arm is placed in the Cotton-Loder position the cast is commonly or ordinarily kept on for a period no longer than six weeks. The cast in the Cotton-Loder position remained on the plaintiff's arm for 36 days. While the jury might have found from the evidence that the defendant was negligent in failing to remove the Cotton-Loder cast before he did, it is our opinion that this was a question of fact and that the court below erred in setting aside the verdict on the ground that negligence in this regard was established as a matter of law.

In point of fact, to decide the question on the strength of Doctor Scanlon's testimony is to decide it upon an issue not tendered in the amended complaint. The charges of negligence (aside from the charge of defendant's lack of experience and knowledge as to which there is no evidence) are (1) that the defendant placed a cast on the plaintiff's arm in the wrong position, (2) that the cast extended too far outward on the fingers of the plaintiff, and (3) that the defendant failed and neglected to remove the first cast and replace it with another in the proper position. The evidence is that the first cast was replaced with another in the Cotton-Loder position, which, according to the plaintiff's medical witness, was the only proper position. It is not charged that the second cast was kept on the plaintiff's arm for too long a period of

time. Neither is it charged that this cast extended too far outward on the plaintiff's fingers and there is no testimony to that effect. Doctor Mickel testified that the Cotton-Loder cast extended "down to the middle of the fingers" but that "you need that position to properly set the fracture".

The precise ground of the court's ruling was that it should have advised the jury that the defendant was negligent with regard to one point, namely, "leaving the cast to the fingertips for too long a period or leaving the cast on to the fingertips." The cast which extended to the fingertips (the first one) was left on the plaintiff's arm for two weeks. There is evidence that a cast so applied may cause stiffness of the fingers and that the usual practice is to extend the cast only as far as the knuckles of the hand. But the defendant considered, as shown by his testimony quoted above, that because of the hypermobility of the fracture it was desirable to depart from the usual practice in order to reduce as much as possible the retraction of the head of the radius.

■ Doctor James W. Brooke, a physician and surgeon called by the defendant, testified that by this procedure the fragments can be better stabilized. Doctor Mickel recognized the problem inherent in the need for immobilization on the one hand and freedom of function of the fingers on the other. Faced with this dilemma and in view of the severity of the fracture, the defendant made the deliberate choice to extend the cast in the manner he did, intending to cut it back at the end of three weeks. We think that it cannot be said as a matter of law that the defendant was negligent in this decision, rather than that he committed an error of judgment, if such it was. See *Malila v. Meacham,* 187 Or 330, 354, 211 P2d 747.

As previously stated, the court, in addition to ordering a new trial on its own motion on the ground just discussed, sustained a motion for a new trial filed by the plaintiff on all the grounds therein specified. The grounds are numerous and include the court's failure to give 12 instructions requested by the plaintiff. As to five of these requests it is conceded by counsel for the plaintiff that they were adequately covered by the court's instructions and as to another that there was no evidence to support it. We have examined all the grounds of the motion which are insisted upon in the plaintiff's brief and are of the opinion that none of them has merit. Discussion of them would serve no useful purpose.

The judgment is reversed and the cause is remanded with directions to enter judgment upon the verdict of the jury.

### ON REHEARING

Gerald H. Robinson and Peterson, Lent & Paulson, Portland, for the petition.

LUSK, J.

In a petition for rehearing the plaintiff criticizes our opinion as erroneously applying the same standard of judicial review to an appeal from an order setting aside a judgment and granting a new trial as is proper

when the appeal is from the judgment. We quote from the petition:

> "Plaintiff contends that in view of the Trial Court's exercise of its discretion in granting a new trial, the proper approach should have been to determine whether it had abused its discretion."

> \* \* \* \* \*

> "The Court conducts its search as if it were looking for reversible error. In fact, the issue is whether the Trial Court abused its discretion; whether, in other words, looking at the record as a whole, there were legitimate grounds for the Trial Court to feel that the plaintiff had been deprived of a fair trial."

> \* \* \* \* \*

> "We must again emphasize the discretionary aspect of the matter when viewed from the Trial Court's point of view. There is sound reason for leaving these matters to the discretion of the Trial Court in view of the fact that he has heard the witnesses, been able to gauge a jury's reaction to the testimony, and has, uniquely, been in a position to view the trial as a whole and ascertain whether justice has been served."

■ It is true that this court examined the record in this case to determine whether it disclosed error, but it is not correct to say, as counsel for plaintiff apparently think, that the trial court in this state has discretion to set aside the verdict of a jury regardless of error. That is the rule in other jurisdictions, but not in Oregon where the constitution prohibits the re-examination by any court of a fact tried by a jury.[1] It is an

---

[1] "In actions at law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict. \* \* \*" Oregon Constitution, Article VII, § 3.

erroneous notion that the circuit courts of this state have discretion to order a new trial because the presiding judge thinks that a jury has returned an unjust verdict or one which is against the weight of the evidence.

The opinion of Mr. Justice RAND in *Timmins v. Hale,* 122 Or 24, 32-33, 256 P 770, contains a definitive statement of the limitations on the power of the circuit courts in this regard. After reviewing prior decisions, the court there said:

"From these decisions it is now settled law in this state that a trial court is authorized to set aside a judgment and grant a new trial because of some error of law occurring upon the trial as to matters not called to the attention of the court during the trial and as to matters to which no exception was taken. But before the court is authorized to act, the error must have been prejudicial and it must have prevented the party in whose interest the power is invoked from having his case fairly presented and tried, and we think it must have been an error which if the matter had been seasonably called to the attention of the court and an adverse ruling made and an exception taken, would have been sufficient to justify the reversal of the judgment upon appeal; for as has been said, 'no man is entitled to more than one fair trial,' and therefore insignificant errors or irregularities which are not prejudicial are not grounds upon which a trial court is authorized to exercise the power of setting aside a judgment on a verdict and granting a new trial. In respect to the necessity of there having been a ruling in the lower court and an exception taken which is requisite to a reversal upon appeal, there is a clear and well-recognized distinction between the power of the trial court on the one hand to set aside a judgment and grant a new trial, and the power of the Supreme Court to

reverse a judgment upon appeal, for it has been repeatedly held by this court, that it is not error alone, but error legally excepted to that constitutes grounds for reversal: *Maddox v. McHatten,* 111 Or. 324 (224 Pac. 833, 226 Pac. 427), and authorities there cited.

"There are other grounds provided for by statute for the setting aside of a judgment and the granting of a new trial in the granting of which the trial court exercises a discretionary power. But as to the matters hereinbefore referred to, namely, the setting aside of a judgment and granting a new trial because of errors of law occurring upon the trial, the court in granting the motion or in setting aside the judgment upon his own motion exercised no discretionary power, for in such case the court is controlled by positive rules of law."

Plaintiff cites *Strandholm v. Gen. Const. Co.,* 235 Or 145, 382 P2d 843, where, citing *Lyons v. Browning et al,* 170 Or 350, 354, 133 P2d 599, we said:

"* * * one of the purposes of the new trial statute is to enable the trial judge to correct errors and to cure miscarriages of justice, notwithstanding the failure of counsel to make a record which should authorize this court to reverse the judgment on appeal."

In both these cases the decisions affirming the orders granting a new trial were based upon errors committed on the trial. This is also true of *Neal v. Haight,* 187 Or 13, 206 P2d 1197 (another case cited by the plaintiff) where we said at page 31:

"The power of the trial court or judge to grant a new trial upon its own motion, setting forth the grounds upon which the order was made is not dependent upon the existence of reversible error as upon appeal to this court, but is dependent upon the existence of prejudicial error, and upon appeal to this court such an order may be affirmed, al-

though no objection or exception was taken in the trial court."

Apart from the foregoing, the plaintiff argues again that errors were committed on the trial and that among these was the failure of the trial court to give a peremptory instruction that the defendant was negligent. We considered this question at length in our former opinion and think it unnecessary to restate our reasons for rejecting the plaintiff's contention. It may be added, however, that the petition for rehearing, in effect, concedes that there was conflict in the evidence upon the effect of the "prolonged immobilization" of plaintiff's hand when it says:

> "All of the expert witnesses in this case, except the defendant himself, agreed in one form or another that the prolonged immobilization which commenced with the improper casting by Dr. Woodmansee and continued for over seven weeks caused all or part of the plaintiff's permanent injury".

ORS 41.260 reads:

> "The direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact except usage, perjury and treason."

Even though there was no other evidence favorable to the defendant on the question, his testimony made an issue for the jury and the jury were the sole judges of his credibility. The fact that, as counsel for the plaintiff say, Dr. Woodmansee "may be said to have a certain interest in the outcome of the case" was a proper matter to be considered by the jury in appraising his testimony, but is irrelevant to the question whether there was a conflict in the evidence.

We expressed the view in our former opinion that the other grounds upon which the order for a new

trial was based did not have sufficient merit to warrant discussion. Two of these are again called specifically to our attention by the petition for rehearing and will be briefly noticed. The court instructed the jury as follows:

"It is a rule of law that one who has sustained injury through the fault of another is bound to lessen the damage as far as practical by the use of ordinary care and diligence and to follow the reasonable instructions and submit to reasonable treatment by the attending physician.

"Thus, if you find that plaintiff failed to follow the instructions of defendant, and you further find that such instructions were reasonable and that as a proximate result of such failure she sustained any greater injury by reason thereof, then in that event plaintiff is not entitled to recover for any greater injury than might have been avoided by the exercise of such care."

Counsel for the plaintiff, in excepting to the instruction, stated:

"I think it must be a correct rule that * * * if she failed to follow the instructions of any doctor who treated her in respect to exercising her hand or fingers, then that would be the test, not limited to the defendant."

Counsel for the defendant agreed with the objection and asked that the jury be so instructed. The court announced that he would so advise them and counsel for the plaintiff withdrew the objection. The court then said that there was no evidence to establish the fact that the plaintiff did not follow instructions to the best of her ability, whereupon counsel for the plaintiff saved an exception to giving the instruction.

The situation presented by this record is somewhat like that we dealt with in the recent case of

*Strandholm v. Gen. Const. Co.,* supra, where insurance was improperly injected into the case to the prejudice of the plaintiff. The circuit court granted a new trial for this error and this court sustained the order notwithstanding that counsel for the plaintiff had deliberately refrained from moving for a mistrial. The difference between the two cases is that the error in the *Strandholm* case was prejudicial, while here the error, if any, was immaterial, since the instruction complained of related to the measure of damages and the jury returned a verdict for the defendant. Thus, it was said by Mr. Justice BRAND in *Penn v. Henderson,* 174 Or 1, 20, 146 P2d 760:

> "By another instruction on damages the court advised the jury in substance that the defendant would not be liable for such damage as was caused by plaintiff's own negligence, if any, in failing to take such steps as a reasonably prudent person would take for the care and repair of his injury. We have grave doubts as to whether there was evidence of any negligent failure by the plaintiff to care for his injury sufficient to justify this instruction; however, we are of the opinion that no error prejudicial to the plaintiff's rights was committed. The question of the defendant's liability was fairly submitted and the jury by its verdict found the defendant not liable. Instructions concerning the measure of damages thus became immaterial."

■ The other claimed error to which specific attention is called consisted in the court instructing the jury that the standard of care which the defendant was required to employ was that of the ordinarily prudent, careful and skillful osteopath. The plaintiff argues that because expert testimony for the plaintiff was given by Doctor Mickel, a doctor of medicine, the jury might have reasoned that he had reference in his

testimony to a standard of care somewhat different from that which applied to the case under the court's instruction.

Before Doctor Mickel gave any testimony relative to the immediate issues in this case, he was asked the following question:

> "And now, Dr. Mickel, do you know whether or not the same general principles in respect to the treatment of Colles' fractures is the same in the field of Osteopathy as compared to the field of medicine?"

He answered: "Yes." There is no evidence to the contrary and no contention to the contrary. It is fanciful to suggest that when Doctor Mickel was later asked by counsel for the plaintiff to explain the standard of care in the community for the reduction of a Colles' fracture and answered the question, any juror would assume that either counsel for the plaintiff or the witness was referring to a standard of care not applicable to the defendant. Since the defendant is an osteopath and the evidence reveals without contradiction that, so far as this case is concerned, he was governed in his treatment of the plaintiff's injury by the same norms that apply to medical doctors, it was entirely proper for the court to instruct upon the standard of care applicable to osteopaths. It seems to us that the plaintiff's criticism of the instruction is captious.

The petition for rehearing is denied.